IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 3, 2025 Session

**STATE OF TENNESSEE v. JEFFREY W. DEAN**

**Appeal from the Circuit Court for Robertson County**
**No. 74CC2-2024-CR-71    Robert Bateman, Judge**

_____

**No. M2024-00822-CCA-R3-CD**

_____

The Defendant, Jeffrey W. Dean, was convicted in the Robertson County Circuit Court of aggravated burglary and possession of a firearm after having been convicted of a prior violent felony and received an effective sentence of twenty years in confinement.  On appeal, he claims that the evidence is insufficient to support his convictions and that his effective sentence is excessive.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which JILL BARTEE AYERS and KYLE A. HIXSON, JJ., joined.

Raven Prean-Morris (on appeal), Assistant Public Defender - Appellate Division, Franklin, Tennessee, and Dan Dalrymple (at trial), Springfield, Tennessee for the appellant, Jeffrey W. Dean.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Robert J. Nash, District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In February 2024, the Robertson County Grand Jury indicted the Defendant for aggravated burglary and possession of a firearm after having been convicted of a prior violent felony.  In March 2024, the trial court held a bifurcated trial, first trying the Defendant for aggravated burglary.

Officer Avery Lambert of the Springfield Police Department ("SPD") testified that on February 2, 2023, he responded to a burglary-in-progress call at a house on Kinney School Road. A woman, who appeared nervous, was in the driveway and identified herself as the homeowner. Officer Lambert waited for back-up officers. When Corporal Breyton Ridgley arrived, Officer Lambert and Corporal Breyton entered the house through the basement. Officer Lambert noticed that the interior frame around the basement door had been broken and that the door appeared to have been kicked in. The two officers cleared the basement and headed upstairs to the main floor, which included the living room, kitchen, and master bedroom. When they got to the top of the stairs, Officer Lambert went to the right to clear the living room and kitchen while Corporal Ridgley went to the left to clear the master bedroom. Detective Brett Keck arrived, and Officer Lambert pointed him in the direction of Corporal Ridgley. After Officer Lambert cleared the living room and kitchen, he heard Corporal Ridgley talking with someone. Officer Lambert went into the master bedroom and noticed a handgun and some other items on the floor. He picked up the gun and secured it in his back pocket for officer safety. He then went into the master bathroom where Corporal Ridgley and Detective Keck were with a white male, who was in the shower. Officer Lambert identified the Defendant in the courtroom as the man in the shower.

Officer Lambert testified that the Defendant claimed someone had invited him into the house. The officers saw clothing on the bathroom floor, so they told the Defendant to get out of the shower and to get dressed. The Defendant said that the clothing on the floor did not belong to him and that he wanted to put on a shirt and a pair of pants that were hanging in the bathroom. The officers determined that the clothes hanging in the bathroom did not belong to the Defendant. At that point, the Defendant admitted that the clothes on the bathroom floor were his clothes.

Officer Lambert testified that the Defendant "said he had nothing to do with the gun." The State played Officer Lambert's body camera video for the jury and questioned him about the video. Officer Lambert acknowledged that when he entered the master bedroom, the top drawer in a chest of drawers was open. To his knowledge, none of the officers had opened the drawer.

On cross-examination, Officer Lambert testified that the Defendant said that he possessed a set of keys to the residence and that he lived nearby on Bolo Road. Officer Lambert did not know of a road by that name in Robertson County. Defense counsel asked Officer Lambert if the Defendant appeared to be "lucid," and Officer Lambert responded, "I'm no medical professional, but he was coherent enough to answer my questions." Officer Lambert acknowledged, though, that the Defendant seemed confused about the year of the Defendant's birth and that the Defendant had "a couple [of] back and forths" about whether he was born in 1986 or 1996. Officer Lambert said that he did not screen

the Defendant for intoxication and that there could be "any number of reasons" for the Defendant's confusion.

Corporal Breyton Ridgley of the SPD testified that he was one of the officers who responded to the scene. He walked across the front yard, went to the back of the house, and met Officer Lambert. They entered the house, cleared the basement, and went upstairs. Corporal Ridgley heard water running in the shower and went to the bathroom in the master bedroom. The Defendant was in the shower and claimed he owned the home. Corporal Ridgley told the Defendant that the homeowner had telephoned the police because someone had broken into the house. The Defendant claimed to have permission to be there and was calm, which Corporal Ridgley thought was unusual because the police had just walked in on the Defendant taking a shower. The Defendant said he had keys to the house and produced a set of keys. Corporal Ridgley tried to open the locks to the house with the keys, but they did not fit any of the locks on the exterior doors.

On cross-examination, defense counsel played Corporal Ridgley's body camera video for the jury. Corporal Ridgley acknowledged that on the video, he could be heard telling the homeowner that "'this might be drugs.'" Corporal Ridgley said that the Defendant's speech was not slurred and that his comment about the Defendant's being on drugs was "speculation." On redirect-examination, Corporal Ridgley testified that he did not know if the Defendant was taking drugs on February 2, 2023. He said that the Defendant understood his questions and that the Defendant answered his questions appropriately.

Jeremey Wright testified that he was the on-call detective for the SPD on February 2, 2023, and that he went to the house on Kinney School Road. When he arrived, officers had transported the Defendant to the police department. Detective Wright noticed a motorcycle helmet and a black duffle bag outside the back door. He walked through the house with the homeowners and saw damage to the door leading into the garage. He went upstairs to the master bedroom and saw belts, clothing, and a partially-wrapped present on the bed. A flashlight, a bank debit card, a watch, gloves, paperwork, and a cellular telephone were on the bedroom floor, and the drawer in a chest of drawers was open. A couple of baseball caps were by the sink in the master bathroom.

Detective Wright testified that he went to the police department and interviewed the Defendant, who claimed that someone named "Chris" had allowed him into the house to take a shower. The Defendant's story changed during the interview. Detective Wright explained,

> It began as he came in through the front door because this Chris person had
> allowed him to and he had just instantly gotten into the shower, then it

progressed to he ate a Pop Tart, then he got into the shower. Then, near the end of the interview, he told me that he went out to the back porch and spoke to Mother Nature and then came in and ate the Pop Tart and took a shower.

The Defendant denied that the items outside the back door belonged to him.

On cross-examination, Detective Wright testified that the weather on February 2, 2023, was "a little cold outside." He acknowledged that during the Defendant's interview, he asked the Defendant, "Are you on anything[?]" Detective Wright said the Defendant responded that "he was not on anything at the time." Defense counsel asked why Detective Wright asked the Defendant about using drugs, and Detective Wright responded, "His eyelids were . . . shuttering up and down at a rapid rate, which is common for people who are on some form of narcotics." Detective Wright said the Defendant also mentioned the "Glory of God" throughout the interview.

Lou Thomas testified that she and her husband owned a two-story house on Kinney School Road. The basement was on the first floor, and the master bedroom was on the second floor. On February 2, 2023, Mrs. Thomas ate lunch at home and left about 12:30 p.m. She returned home about 5:00 p.m. and noticed a black duffle bag underneath the deck behind the house. Mrs. Thomas went to the back door and saw that it had been kicked in, so she telephoned the police. The police entered the house and found the Defendant. Mrs. Thomas said that she had never seen the Defendant before February 2, 2023, and that he did not have permission to be in her house.

Mrs. Thomas testified that the police brought clothing to her which she identified as belonging to her husband. After the police removed the Defendant from the house, Mrs. Thomas walked through the house with Detective Wright. A kitchen cabinet was open, a box of Pop Tarts was open, and some Pop Tarts were missing from the box. Personal items were on the floor of the master bedroom and on the bed. Mrs. Thomas said that the items on the floor belonged to her husband and that he kept them in a chest of drawers in their bedroom. One of the items on the bed was a partially-wrapped Christmas present for her nephew. The present had been completely wrapped and put away when she left after lunch. Moreover, none of the items on the floor and on the bed were there when she left. The hats beside the bathroom sink did not belong to her or her husband, and someone had taken a set of wind chimes out of the chest of drawers in the master bedroom and had hung the wind chimes outside. On cross-examination, Ms. Thomas testified that the set of wind chimes was the only item missing from inside the house.

Detective Brett Keck of the SPD testified that he responded to a burglary-in-progress call on Kinney School Road on February 2, 2023. When he arrived, two other officers were already inside the house. Detective Keck went upstairs and heard Corporal

Ridgley call out that someone was in the shower. Detective Keck went into the master bathroom. The Defendant was in the shower, and Corporal Ridgley was talking with him. At first, the Defendant claimed that he was the homeowner and that he had keys to the house. He then said the homeowner had allowed him into the house to take a shower. The Defendant was naked, so the officers told him to get out of the shower and to get dressed. Detective Keck noticed that some clothes were on the bathroom floor, but the Defendant wanted to put on some clothes that were hanging in the bathroom. Detective Keck asked the Defendant if the Defendant's clothes were on the bathroom floor. When the Defendant said yes, Detective Keck took the clothes that were hanging in the bathroom to Mrs. Thomas. After Mrs. Thomas identified the clothes as belonging to her husband, Detective Keck told the Defendant to put back on his clothes that were on the bathroom floor. The State played Detective Keck's body camera video for the jury. Detective Keck acknowledged that a chest of drawers was in the bedroom and that one of the drawers was open. A window was by the chest of drawers, and a window was in the bathroom. The blinds on both of the windows were raised.

John Thomas, Lou Thomas's husband, testified that on February 2, 2023, he left home for work about 8:00 a.m. He said that he kept a Glock 43 handgun in a gun case and that he kept the gun case in a chest of drawers in the master bedroom. The gun case was in the chest of drawers when he left that morning. After law enforcement removed the Defendant from Mr. Thomas's house, officers allowed Mr. and Mrs. Thomas to go into the house to look around. Mr. Thomas said that "it was pretty obvious that [the Defendant] had been in there going through our rooms." Mr. Thomas's clothing and the gun case, which was empty, were on the bed, and additional items from his chest of drawers were on the floor. Mr. Thomas said he thought the Defendant was "just sorting out what [the Defendant] wanted." A police officer later returned Mr. Thomas's Glock 43 to him. Mr. Thomas said that he had never seen the Defendant prior to the break-in and that the Defendant did not have permission to be in his house. On cross-examination, Mr. Thomas testified that the only item missing from inside the house was a set of wind chimes which someone had hung on the porch.

Charles Arms testified that he was a criminal investigator for the district attorney's office and that he went to the house on Kinney School Road sometime after the crimes to photograph the scene. The window in the master bathroom faced the front yard and Kinney School Road, and the window by the chest of drawers in the master bedroom faced a neighbor's house. Mr. Arms noted that a person looking out the bathroom window could have seen Corporal Ridgley walking across the front yard and that a person looking out the bedroom window could have seen officers arriving at the back of the house.

The Defendant did not present any evidence. The jury convicted him of aggravated burglary.

In the second phase of the trial, the State presented evidence of the Defendant's being a felon in possession of a weapon after having been convicted of a violent felony. The State introduced into evidence two collective exhibits. The first exhibit consisted of certified copies of the Defendant's 2006 judgments of conviction for three counts of aggravated assault. The second collective exhibit consisted of certified copies of the Defendant's 2012 judgments of conviction for one count of aggravated kidnapping and one count of carjacking.

Mr. Thomas testified that he kept his Glock 43 in a "zipped up" case and that he kept the case in a chest of drawers in the master bedroom. The gun case was in the chest of drawers when he left for work on the morning of February 2, 2023. The State showed Mr. Thomas a photograph of the bed in the master bedroom after the break-in, and Mr. Thomas identified his empty gun case on the bed. A police officer later returned his Glock 43 to him. On cross-examination, Mr. Thomas testified that he owned about twenty guns but that the Glock 43 was the only gun he kept in the chest of drawers.

Officer Lambert testified that when he entered the master bedroom, a gun was on the floor. Officer Lambert picked up the gun because it was unsecured and could have been dangerous to the officers. He was not wearing gloves, so his fingerprints would have been on the gun. On cross-examination, Officer Lambert acknowledged that the gun was not tested for fingerprints. He also acknowledged that the Defendant was not in the same room with the gun when Officer Lambert first encountered the Defendant.

The Defendant testified on his own behalf that he entered the house with permission. He said that he did not know if the gun was on the bedroom floor when he went into the bedroom because he "paid no attention to it." He said he did not know how the gun ended up on the floor.

On cross-examination, the Defendant testified that he did not see the gun or any other items on the floor. He said that he could not remember the name of the person who let him into the house because he was taking psychiatric medication. The person also gave him permission to wear the clothes that were hanging in the bathroom. The State asked, "Where did you meet this person at?" The Defendant answered, "I met him when I was walking down the road a couple of days before that." He acknowledged that he ate a Pop Tart before he went into the master bedroom but denied touching any of the items that were on the floor or on the bed. He also denied unwrapping the present that was on the bed and said that the black duffle bag on the back porch did not belong to him. At the conclusion of the proof, the jury convicted the Defendant of possession of a firearm after having been convicted of a prior violent felony.

ANALYSIS

## I.  Sufficiency of the Evidence

The Defendant claims that the evidence is insufficient to support his convictions. When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).  The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

### A.  Aggravated Burglary

The Defendant contends that the evidence is insufficient to support his aggravated burglary conviction because his intoxication, coupled with his auditory and visual hallucinations, negated his ability to enter the house with the intent to commit a theft and because his compromised mental capacity provided an acceptable excuse for his entry into the house.  He asserts that, at most, he is guilty of some form of criminal trespass.[1]  The State argues that the evidence is sufficient.  We agree with the State.

---

[1] "A person commits criminal trespass if the person enters or remains on property, or any portion of property, without the consent of the owner."  Tenn. Code Ann. § 39-14-405(a).  Relevant to this case,

During the State's closing arguments in the first phase of the trial, the prosecutor argued that the Defendant was in the process of gathering Mr. and Mrs. Thomas's property for a theft when he saw the police officers arrive and that he got into the shower as a ruse to get the officers to think he had a right to be in the house. Defense counsel argued that the officers' body camera videos showed that the Defendant was "intoxicated or a bit off" and, therefore, that he did not enter the home with the intent to commit a theft. Defense counsel noted that the Defendant moved items but did not take any property despite having time to do so.

Aggravated burglary is burglary of a habitation. Tenn. Code Ann. § 39-13-1003(a). As charged in this case, "[a] person commits burglary who, without the effective consent of the property owner . . . [e]nters a building other than a habitation . . . with intent to commit a . . . theft[.]" *Id*. at § 39-13-1002(a)(1). The specific intent required for a burglary may be established by circumstantial evidence. *See Bollin v. State*, 486 S.W.2d 293, 296 (Tenn. Crim. App. 1972). When a defendant breaks into and enters a building containing valuable property with the absence of an "acceptable excuse" for doing so, the jury may "reasonably and legitimately infer . . . a defendant intends to commit theft." *State v. Ingram*, 986 S.W.2d 598, 600 (Tenn. Crim. App. 1998) (citing *Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973)).

Tennessee Code Annotated section 39-11-503(a) provides that voluntary intoxication "itself is not a defense to prosecution for an offense. However, intoxication . . . is admissible in evidence, if it is relevant to negate a culpable mental state." "Proof of voluntary intoxication is therefore akin to proof of a mental disease or defect that prevents a defendant from forming the culpable mental state required for the offense under consideration." *State v. Hatcher*, 310 S.W.3d 788, 814 (Tenn. 2010).

In support of his argument that the evidence is insufficient to show he entered the house with the intent to commit a theft, the Defendant attempts to distinguish his case from *State v. Peters*, No. E2022-01558-CCA-R3-CD, 2023 WL 6389525, at *1 (Tenn. Crim. App. Sept. 29, 2023), *no perm app. filed*, in which this court upheld a defendant's aggravated burglary conviction. Like the instant case, Mr. Peters entered a home without the homeowners' consent, and the homeowners returned while he was still in the residence. *Id*. A police officer arrived and discovered that there had been no forced entry and that nothing had been taken. *Id*. at *2. However, "there were personal belongings strewn about, drawers and doors left open, and various items out of place, including the contents of [the female homeowner's] purse." *Id*. at *4. Mr. Peters told the officer that he entered the home

"[a] person commits aggravated criminal trespass who enters or remains on property when . . .[t]he person knows the person does not have the property owner's effective consent to do so[.]" *Id*. at § 39-14-406(a)(1).

because a person in a truck was chasing him and that his cellular telephone showed the home was a "'safe house'" for drug users. *Id*. at *1. The officer's body camera recorded Mr. Peters talking with the officer, and the State played the video for the jury. *Id*. On appeal, Mr. Peters claimed that the State did not present any evidence that he entered the residence with the intent to commit a theft. *Id*. at *3. This court disagreed. Noting that Mr. Peters was the only person in the home when the homeowners returned, that nothing in the record corroborated his story of being chased by a truck, and that he did not call the police after the alleged truck incident, this court held that the evidence was sufficient to support his conviction of aggravated burglary. *Id*. *4.

The Defendant contends that unlike *Peters*, the evidence is insufficient in this case because the proof shows that he was intoxicated and suffering from hallucinations when he entered the house. However, taken in the light most favorable to the State, the evidence established that the Defendant forcefully entered the house by kicking in the basement door. He did not have permission from Mr. and Mrs. Thomas to enter their house. He went upstairs to the main floor, removed a box of Pop Tarts from a kitchen cabinet, and ate a Pop Tart. He then went into the master bedroom, removed items from Mr. Thomas's chest of drawers, and put some of the items on the floor and some of the items on the bed. At some point, he found a wrapped present and partially unwrapped it. He also took a set of wind chimes from the chest of drawers and hung the wind chimes outside on the porch. Although the Defendant contends on appeal that he was intoxicated, possibly by methamphetamine, when he broke into the home, Officer Lambert testified that the Defendant was able to answer his questions.[2] Corporal Ridgley testified that the Defendant's speech was not slurred, that the Defendant understood his questions, and that the Defendant answered his questions appropriately. The State played the body camera videos of all three responding officers for the jury, so the jurors were able to observe the Defendant's demeanor and behavior at the time of the crimes. Accordingly, even if the Defendant was intoxicated when he entered the house, the jury obviously accredited the State's witnesses and determined that the Defendant was not so intoxicated that he could not form the intent to commit a theft. In sum, a rational jury could have found beyond a reasonable doubt that the Defendant entered the house without the consent of the homeowners and with the intent to commit a theft. Therefore, he is not entitled to relief.

## B. Possession of a Firearm

The Defendant claims that the evidence is insufficient to support his conviction of possession of a firearm after having been convicted of a prior violent felony. The State argued during its closing arguments in the second phase of the trial and argues on appeal that the Defendant actually possessed the firearm because the proof showed that he took

---

[2] The Defendant did not request a jury instruction on voluntary intoxication.

the gun case out of the chest of drawers, opened the case, and removed the gun from the case. We agree with the State.

The indictment charged the Defendant with violating Tennessee Code Annotated section 39-17-1307(b)(1)(A), which provides that "[a] person commits an offense who unlawfully possesses a firearm . . . and . . . [h]as been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon[.]" Possession of a firearm can be either actual or constructive. *See State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014). Actual possession refers to a defendant's physical control over an item whereas constructive possession requires only that the defendant have the power and intention to exercise dominion and control over the item. *Id*.

Taken in the light most favorable to the State, the evidence shows that Mr. Thomas's gun was in the zippered gun case, which was in Mr. Thomas's chest of drawers when Mr. Thomas left for work that morning. Officer Lambert testified that upon entering the master bedroom, he saw the unsecured gun on the floor and put the gun into his back pocket for officer safety. Mr. Thomas testified that after the police removed the Defendant from his house, he walked through the residence and saw his empty gun case on the bed. A police officer later returned Mr. Thomas's gun to him. Although the Defendant testified that he did not see the gun on the floor and that he did not remove the gun case from the chest of drawers, the jury heard the proof and accredited the testimony of Mr. Thomas. Therefore, the evidence is sufficient to show that the Defendant had physical control over the gun and, consequently, that he had actual possession of the gun while he was in the house. The evidence is sufficient to support his conviction.

## II. Sentencing

The Defendant claims that his effective twenty-year sentence is excessive because it is greater than the sentence deserved for the offenses committed and is not the least severe measure necessary to achieve the purposes and principles of sentencing. In support of his claim, he contends that his use of drugs and alcohol at a very young age contributed to his subsequent substance abuse, which then contributed to his criminal history. He further contends that he was suffering from homelessness, substance abuse disorder, and auditory and visual hallucinations at the time of the offenses and that the offenses were nonviolent and resulted in minimal damage to the door of the home. The State argues that the trial court acted within its discretion when it imposed the effective twenty-year sentence. We agree with the State.

The trial court held a sentencing hearing on April 12, 2024. At the outset of the hearing, the State introduced into evidence the same collective exhibits that the State had introduced in the second phase of the trial, showing the Defendant's prior convictions of

aggravated kidnapping and carjacking, Class B felonies, and three prior convictions of aggravated assault, Class C felonies. The State also introduced the Defendant's presentence report into evidence.

According to the presentence report, the then thirty-seven-year-old Defendant served three years in a juvenile facility when he was fourteen years old and dropped out of high school in the eleventh grade. The Defendant stated in the report that he served two sentences in prison and attended drug programs in prison but that "gang members and dealers in those programs used them more to find users to sell to [than] help him with his drug addiction." The Defendant reported that he was being treated for an unspecified mental health disorder that was characterized by auditory and visual hallucinations and that he was receiving treatment in the form of daily medications and monthly counseling sessions. He described his physical health as good. The Defendant stated in the report that he began using alcohol and marijuana when he was six or seven years old and that he was using methamphetamine daily when he was arrested for the crimes in this case. The Defendant reported that he worked part time for a factory and did odd jobs but that he could not remember any other employment due to his drug use. The report showed that in 2009, the Defendant was suspected of being a member of the Aryan Nations gang.

In addition to the Defendant's prior convictions of aggravated assault in 2006, aggravated kidnapping in 2012, and carjacking in 2012, the report showed that he was convicted of public intoxication and simple possession in 2022 and that he had prior misdemeanor convictions of evading arrest in 2011, failure to appear in 2006, and theft in 2005. The report also showed that Defendant's probationary sentence for a failure to appear conviction had been revoked and that he was ordered to serve the sentence in confinement. The Defendant served his aggravated assault sentences in prison from 2006 to 2010. During that time, he received multiple disciplinary write-ups for creating a disturbance, using or exchanging an intoxicant, possessing contraband, attempting to intimidate staff, threatening an employee, provoking staff or inmates, and five incidents of possessing a deadly weapon. The report showed that the Defendant committed aggravated kidnapping and carjacking in September 2010 and that he served his sentences for those convictions in prison from 2013 to 2022. During that time, the Defendant again received multiple disciplinary write-ups for infractions such as tampering with security equipment, creating a disturbance, possessing a deadly weapon, provoking staff or inmates, destruction of state property, refusing to comply, defiance, and assaulting staff with and without a weapon. The Defendant's risk and needs assessment classified his potential for violence and drug use as high.

Mrs. Thomas testified that the Defendant damaged her home when he kicked in the back door. She said that the door fell onto her car, which was parked in the garage, and that the knob on the back door was "messed [up]." Mrs. Thomas and her husband paid

approximately $275 to repair the door, but they "buffed" out the damage to her car themselves. She said that due to the Defendant's breaking into her home, she became "a little bit . . . afraid to come up the driveway and go into the house when it gets a little bit darker." She acknowledged that the incident on February 2, 2023, was "even scarier" because the Defendant was still in the house when she arrived home.

The Defendant testified on his own behalf that he began consuming alcohol with his grandfather when he was six or seven years old. His substance abuse progressed from alcohol to drugs, including hallucinogens. The Defendant stated that at the time of his police interview with Detective Wright, he had been awake for at least four days due to methamphetamine, was "hearing voices and seeing things," and "wasn't there at the moment due to the lack of sleep and the methamphetamine." The Defendant said he spent four and one-half years of a five-year sentence in prison for the three aggravated assault convictions. He said the assaults occurred because "somebody tried to rape my mother and I took it upon myself to take the law in my own hands. I know it wasn't right." When the Defendant was released from prison for the aggravated assaults, he started using drugs again, was charged with and convicted of aggravated kidnapping and carjacking, and served eleven and one-half years of a thirteen-year sentence in confinement. The Defendant acknowledged that he took drug classes in prison but said that the classes were not helpful because the "gang bangers pretty much run that place." He denied being a member of the Aryan Nations.

The Defendant acknowledged having disciplinary problems in prison. He explained,

> Doing a lot of time in the State Penitentiary, you kind of grow to adapt to your situation and it is a lot of negative and angry and violence in there. I done a lot of drugs. Drugs make me something that I don't like to be and a lot of them assaults is not as bad as they seem, you know what I mean? Like they said it was a deadly weapon, wasn't no deadly weapons ever used in the assault.

The Defendant testified that he had been in the Robertson County Jail since February 2, 2023, the date of his arrest in this case, and that he had not had any discipline problems "this time." He stated, "I have gotten to where I am thinking about my life and the history of the mistakes that I made and what I can [do] to overcome and improve my life[.]" He apologized to Mrs. Thomas for making her afraid to come home and asked the trial court to consider that he did not take any property or harm anyone. He requested that the trial court "show mercy" and order concurrent sentencing or probation.

- 12 -

The Defendant produced a letter for the trial court's consideration, and the trial court admitted the letter into evidence. The letter, dated February 5, 2024, stated that the Defendant had been accepted into the substance abuse program at Safe Harbor upon his release from confinement.

On cross-examination, the Defendant acknowledged that soon after he was released from prison for committing aggravated assault, he committed aggravated kidnapping and carjacking. He was released from prison for those convictions on August 10, 2022, committed public intoxication and simple possession, and spent some time in jail. On February 2, 2023, less than six months after being released from prison, he committed the offenses in this case.

The trial court stated that it had considered the principles and purposes of sentencing, the evidence at trial and sentencing, the presentence report, the arguments by counsel as to sentencing alternatives, the nature and characteristics of the criminal conduct involved, enhancement and mitigating factors, statistical reports from the Administrative Office of the Courts, the Defendant's testimony at sentencing, and the results of his risk and needs assessment. The trial court found that the Defendant was a Range II, multiple offender and, therefore, that his range of punishment for possession of a firearm with a prior violent felony, a Class B felony, was twelve to twenty years and that his range of punishment for aggravated burglary, a Class C felony, was six to ten years. *See* Tenn. Code Ann. § 40-35-112(b)(2), (3).

The trial court first addressed the Defendant's request for probation. The court noted that the sentence for possession of a firearm was not probatable due to the Defendant's range of punishment for the offense. *See id.* at § 40-35-303(a) (providing that a defendant is eligible for probation if the sentence imposed is ten years or less). Regarding the aggravated burglary conviction, the trial court stated that it had considered "all the relevant factors, including the Defendant's amenability to corrections, the circumstances of the offense, the Defendant's criminal record, the Defendant's social history, the Defendant's physical and mental health, and general deterrence value." The trial court concluded that, considering the circumstances of the offense, probation was not appropriate because the Defendant stayed in the victims' home for an extended period of time and even took a shower after he gathered the items he was going to take with him. The trial court concluded that the Defendant's criminal record also did not support a sentence on probation.

Next, the trial court addressed the length of the sentences. The court found that enhancement factor (1), that the Defendant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," applied to his convictions. *See id.* at § 40-35-114(1). The trial court ordered that the

Defendant serve twenty years for possession of a firearm after having been convicted of a violent felony and ten years for aggravated burglary. The trial court found that given the Defendant's extensive criminal history, it could order that the Defendant serve his sentences consecutively. *See* Tenn. Code Ann. § 40-35-115(b)(2). Nevertheless, the trial court stated that "the Court having imposed a sentence at the upper end of the range in both cases in its discretion, orders these to be served concurrent."

This court reviews the length, range, and manner of service imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). In determining a defendant's sentence, the trial court is to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the mitigating and enhancement factors, (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, (7) any statement by the Defendant in his own behalf about sentencing, and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the Defendant to demonstrate the impropriety of his sentence. *See* Tenn. Code Ann. § 40-35-401, Sent'g Com'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

*Id*. at § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory factors are advisory only. *See id*. at § 40-35-114; *see also Bise*, 380 S.W.3d at 701; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is

free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id*. at 346.

Here, the trial court applied enhancement factor (1) to the Defendant's convictions based on his criminal history, and obviously gave the factor great weight, enhancing his sentences to the maximum punishment in the range for each conviction. The record supports the trial court's application of the factor and its decision to give the factor great weight. The presentence report reflects that the Defendant had been committing crimes since he was eighteen years old and that he had violated a previous sentence of probation. He had spent a significant amount of his adult life incarcerated for serious crimes. In the brief amount of time the Defendant had been in society as an adult, he continued to commit crimes. The Defendant spent four and one-half years in confinement for aggravated assault, was released from confinement in 2010, and committed aggravated kidnapping and carjacking in September 2010. He then spent eleven and one-half years in prison for aggravated kidnapping and carjacking. Less than six months after being released from prison for those offenses, he committed the crimes in this case. The Defendant blames much of his criminal history on his substance abuse. Although he attended drug programs in prison, he did not think they were helpful in treating his addiction and did not seek any other treatment until faced with confinement in this case. Therefore, we conclude that the trial court did not abuse its discretion by ordering an effective sentence of twenty years in confinement.

## CONCLUSION

Upon review, we affirm the judgments of the trial court.

s/ John W. Campbell
JOHN W. CAMPBELL, SR., JUDGE

- 15 -